```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF IOWA
                      CENTRAL DIVISION


- - - - - - - - - - - - X
VERMEER MANUFACTURING        :
COMPANY,                     :
                             :
      Plaintiff,             :
                             :
vs.                          :      Case No. 4:17-cv-00076
                             :
THE TORO COMPANY,            :        HEARING TRANSCRIPT
                             :
      Defendant.             :
- - - - - - - - - - - - X
```

Judge's Chambers
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Tuesday, July 21, 2020
12:58 p.m.


BEFORE:  THE HONORABLE CHARLES R. WOLLE, Senior Judge.


APPEARANCES:

For the Plaintiff:        RICHARD L. BROPHY, ESQ.
(Via telephone)           MARC WADE VANDER TUIG, ESQ.
                          Armstrong Teasdale LLP
                          7700 Forsyth Boulevard, Suite 1800
                          St. Louis, Missouri  63105


For the Defendant:        JEFFREY D. HARTY, ESQ.
(Via telephone)           Nyemaster Goode P.C.
                          700 Walnut Street, Suite 1600
                          Des Moines, Iowa  50309


              KELLI M. MULCAHY, CSR, RDR, CRR
                 United States Courthouse
            123 East Walnut Street, Room 115
                 Des Moines, Iowa 50309

P R O C E E D I N G S

1

2          (In chambers, with counsel present via telephone.)

3          THE COURT:  Good morning.  This is Judge Charles

4 Wolle.  Who else is on the phone right now?  Is there a lawyer

5 on behalf of Toro?

6          MR. HARTY:  Yes, Your Honor.  This is Jeff Harty at

7 Nyemaster on behalf of Toro.

8          THE COURT:  Anyone else?

9          MR. HARTY:  Not today, Judge.

10          THE COURT:  All right.  And on behalf of Vermeer?

11          MR. VANDER TUIG:  Yes, Your Honor.  This is Marc

12 Vander Tuig on behalf of Vermeer, and I believe Richard Brophy

13 may be on the line as we will.

14          MR. BROPHY:  Yes, Your Honor.

15          THE COURT:  And who will make the oral argument this

16 morning -- or this afternoon on behalf of Vermeer?

17          MR. BROPHY:  Your Honor, that will be me, Richard

18 Brophy.

19          THE COURT:  Mr. Brophy, all right.

20          And who will make the argument on behalf of Toro?

21          MR. HARTY:  Judge, this is Jeff Harty.  I will.

22          THE COURT:  Very good.  And have we a court reporter?

23 I think the reporter scheduled for today is Chelsey.  Are you

24 on?

25          THE COURT REPORTER:  Judge, this is Kelli Mulcahy.

1   I'm the reporter for today.

2            THE COURT:  Oh, Kelli Mulcahy.  All right.

3            And let me know before the call ends if you wish to

4   have a written transcript available for this hearing.

5            So we'll start with Mr. Brophy.  I've granted the

6   request for oral argument, and you may make argument on all

7   motions you wish to have me address.

8            MR. BROPHY:  Thank you, Your Honor.

9            To be clear, this is Richard Brophy on behalf of

10  Vermeer, but we are currently responding to these motions.

11  Would you like me to go first?

12            THE COURT:  Oh, I'm sorry.  No.

13            Mr. Harty.

14            MR. HARTY:  Thank you, Judge.  Good afternoon.

15            With respect to the -- as I understand it, we've got

16  two motions up for hearing today.  The first is Toro's motion to

17  reconsider Your Honor's order striking portions of the final

18  invalidity contentions, and that's what I'll start with.

19            Certainly seeking reconsideration of one of Your

20  Honor's rulings is not something we do lightly, but, Judge, I

21  submit that what's perhaps gotten lost in all of the compelling

22  argument presented in the last hearing is a statement, an

23  admission, in fact, that Vermeer makes in its brief, page 3 of

24  their resistance to the present motion.  They state that, "The

25  entire motion," the motion to strike, "was premised on a

1  violation of the Scheduling Order under Rule 16(f)."

2         No doubt about it, Rule 16(f) does allow the Court to

3  sanction a party for failing to obey a scheduling order.  Toro

4  didn't violate any order, and Vermeer has not shown that we

5  violated an order.

6         The relevant provision of the scheduling order, and

7  that's at Docket 98, Judge, it provides as follows:  That the

8  defendant, here Toro, shall serve final non-infringement and

9  invalidity contentions, including Defendant's final

10 non-infringement claim chart and Defendant's final invalidity

11 claim chart, within 21 days after service of the plaintiff's

12 final infringement claim chart.  That's it.

13        That's what we did.  Toro met the deadline.  Toro

14 timely filed its final invalidity contentions on May 15th, and

15 that's all the order required.  And for that reason alone,

16 Judge, the Court should reconsider its prior ruling and strike

17 Vermeer's motion in its entirety.

18        The scheduling order, Your Honor, is clear:  You file

19 your contentions by the deadlines.  It doesn't say only if the

20 other party agrees.  It doesn't say you only file them if you

21 can't -- it doesn't say you can't modify or supplement your

22 contentions.  It doesn't say you need good cause to change

23 anything.  It doesn't say anything about having a legitimate

24 excuse.  I think those were Vermeer's words that found their way

25 into Your Honor's order.

1          Now, if a party wishes to amend its final invalidity

2   contentions, the scheduling order definitely requires a showing

3   of good cause.  That's express in there.  But that's not where

4   we are.

5          What I read you from the scheduling order was from the

6   patent addendum portion of that scheduling order, Document 98,

7   the portion of the order the parties negotiated, they agreed to,

8   the Court adopted.  And what Vermeer has done is concoct a story

9   of what the scheduling order means that simply isn't true.

10          Now, there's also --

11          THE COURT:  I will now interrupt Mr. Harty and allow

12   counsel for Vermeer, Mr. Brophy, to respond to the argument that

13   the Court's motion -- order that granted the motion to strike

14   should be reconsidered.

15          Mr. --

16          MR. BROPHY:  Your Honor, thank you.  Richard Brophy

17   here.

18          Obviously, it's our position that Your Honor got it

19   right the first time, and our view is that this motion for

20   reconsideration is nothing more than a second bite at the apple

21   because Toro didn't like the answer they received the first

22   time.

23          There is no objective basis for Toro to seek

24   reconsideration of this order.  I understand that counsel

25   doesn't like the result, but that doesn't give them permission

1  or leave to file a new motion for reconsideration.

2          The fact of the matter is Toro waited until the

3  eleventh hour to disclose a mountain of new prior art arguments

4  against us in this case.  They have known about those references

5  since the very inception of this case.  In fact, they used some

6  of those references against us in reexamination, arguing at the

7  time that it would streamline the process for the Court.

8          Well, they lost those reexaminations, and now they

9  want to have new arguments, multiplying these proceedings.

10  Rather than distilling and crystallizing the issues, they want

11  to add new issues at the eleventh hour.  They could have

12  identified those materials far earlier, and there is absolutely

13  no reasonable interpretation of the Court's scheduling order

14  that would allow a party to sandbag their references and their

15  obviousness arguments until the eleventh hour.  They could have

16  raised them earlier; they should have raised them earlier.

17          I take issue with counsel's point that we simply

18  relied on the language of the scheduling order.  The Court also

19  has the inherent power and control of the docket, and that

20  certainly includes requiring parties to be forthcoming with the

21  arguments they intend to disclose and rely on in the case, and

22  it's crystal clear here that Toro did nothing of the sort.

23          They knew about these arguments.  They could have

24  raised them earlier.  They chose not to.  They sandbagged until

25  the eleventh hour, and the Court properly excluded them for that

1  reason.

2          THE COURT:  And a reply argument on the motion for

3  reconsideration, Mr. Harty.

4          MR. HARTY:  Yes, Judge.  I'll be brief.

5          There's no sandbagging here.  One of the points I

6  think is lost is certainly you have initial contentions, then

7  you have final contentions, and one of the purposes of final

8  contentions is so that you can take into account what happens in

9  a case and what happens in discovery, and in this instance, also

10  what happens in the patent office.

11          I deposed the patent attorney on record who went --

12  who handled the reexaminations, and he told me -- he was very

13  frank.  He told me Mr. Brophy, Mr. Vander Tuig assisted him in

14  those ex parte proceedings.  Now, there's no doubt about it,

15  we're entitled to take that into account.

16          And also, Judge, we didn't have the opportunity to

17  take the lead inventor's deposition until right at the end of

18  the discovery, on May 6th, when this vertical lift large skid

19  steer study came to light.  And that certainly shed light on the

20  relevant prior art, what one of ordinary skill in the art, how

21  they would -- what they would consider to be relevant and the

22  references that came out of that.

23          At the end of the day, what we're talking about,

24  Judge, are four combinations, four combinations of prior art.

25  They want to go on about this 500 pages.  There's thousands of

1  pages.  The reason I've added 500 pages is because there's 87

2  claims.

3          But this was not -- this was in no way an attempt to

4  ambush, but to, in their words, really crystallize, based on

5  what had happened in the case, including the deposition of the

6  lead inventor, Mr. Thomas, so that we can put our best foot

7  forward with those references.

8          There's no prejudice.  The references were known to

9  them, and we essentially took what was in discovery and

10  distilled it down so that we could put forth those combinations

11  of references to mount our obviousness defense, and it's really

12  as simple as that.

13          MR. BROPHY:  Your Honor, may I address that?

14          THE COURT:  Yes.

15          MR. BROPHY:  Your Honor, they have had these

16  references since the beginning of this case.  They have had

17  the --

18          THE COURT:  And this is Mr. Brophy, right?

19          MR. BROPHY:  Yes, Your Honor, I apologize.  Mr. Brophy

20  on behalf of Vermeer.

21          THE COURT:  All right.

22          MR. BROPHY:  They have had the prior art references

23  that they're now relying on since the beginning of this case.

24  They have had the vertical lift skid steer study that they

25  incorrectly based the appropriateness of their contentions on

1   since December of 2018.  And there is nothing in Mr. Thomas'

2   deposition, as we've addressed on numerous occasions in front of

3   this Court in our briefing, that would give rise to them adding

4   these new invalidity arguments.  They have had them forever.

5              There is simply no reason, there is no justification

6   for them waiting until the eleventh hour of this case to spring

7   them on us.  If they believed that the patents were invalid

8   based on the prior art that was sitting in their hands on their

9   desks, they should have identified it more timely, and they

10   didn't.

11              They waited and waited and waited until fact discovery

12   disclosed and then sprang them on us.  And that's not -- that's

13   not the purpose of the scheduling order, that's not the purpose

14   of these patent law disclosures, and it's inappropriate, and

15   this motion for reconsideration should be denied for that

16   reason.

17              THE COURT:  I want to make sure that we're all on the

18   same scheduling order.  So what I want to remind you of and make

19   sure I'm clear on this:  The order that sets trial in this case

20   for June 7th of next year was entered on March 20, 2020.  That

21   was Magistrate Judge Helen Adams entering an order that set the

22   jury trial for June 7th, 2021, with a final pretrial conference

23   May 17 of 2021.

24              From your filings, I have the impression that you

25   believed this case had been rescheduled for an earlier time.

1  Let me go to each of you.

2          Jeff Harty, do you agree that the final scheduling

3  order in this case was entered on March 20 of 2020?

4          MR. HARTY:  Yes, Judge, I do.  I don't have it in

5  front of me, but it is the order that sets the trial for June

6  7th of 2021.  Yes, that's our understanding, and that was the

7  most recent scheduling order.

8          THE COURT:  And I want to emphasize that with the

9  final pretrial conference on May 17, I want both sides to file

10  their proposed verdict forms and jury instructions well before

11  the final pretrial conference.  I think if you all can file and

12  perhaps agree on what the Court would submit to the jury as

13  through a charge and verdict forms, you might have less

14  disagreement on how to reach the point where the case goes to

15  the jury.

16          So Mr. Harty has spoken to the question of scheduling.

17  Mr. Brophy, do you agree that the trial is set for June 7 of

18  2021?

19          MR. BROPHY:  Yes, Your Honor.  And just perhaps a bit

20  of context.  We worked with Judge Adams to amend the schedule

21  and shift the trial date back as a result of the COVID-19

22  pandemic, and that's our understanding, that the schedule that

23  you just identified is the result of that adjustment of the

24  schedule.  And I'll just leave it at that.

25          THE COURT:  Thank you.

1          So now that we know how much time remains until trial

2     will begin, is there any objection to submitting well before the

3     final pretrial conference either an agreed or proposed

4     conflicting but filed simultaneously jury charge and verdict

5     forms?

6          Do you have any objection to that?

7          MR. BROPHY:  Your Honor, Richard Brophy on behalf of

8     Vermeer.  We do not have any objection to that.

9          MR. HARTY:  On behalf of Toro, this is Jeff Harty.  We

10    don't have any objection to that either, Your Honor.

11         THE COURT:  All right.  I think I'll set a new date,

12    well before the final pretrial conference.  It will be an easy

13    to remember date.  By February 1 of 2021, the parties shall file

14    agreed or separate conflicting proposed jury charge and verdict

15    forms.

16         Now I'll address the other issues that Toro wishes to

17    present today about amending their answer and the factual basis

18    for their contentions that the patent is invalid.

19         MR. HARTY:  Thank you, Your Honor.  This is Jeff Harty

20    again on behalf of Toro.

21         THE COURT:  Yes.  Mr. Harty.

22         MR. HARTY:  And so now turning to Toro's motion for

23    leave to amend the factual basis for its inequitable conduct

24    defense and also to withdraw two affirmative defenses.  I don't

25    think there's any dispute as to the withdrawal of the two

1  affirmative defenses, those being unconscionability and failure

2  to mitigate, and so I'll turn to the fighting issue, which is

3  leave to amend to -- leave to amend the factual basis for

4  inequitable conduct defense.

5       Judge, this is the way that Vermeer got its patents

6  allowed in the reexamination.  And what I'm talking about are

7  the '386 patent and the '750 patents.  The examiner was

8  particularly persuaded, said so, with what one of the named

9  inventors, Mr. Louis Hartke, had to say in sworn statement about

10  two things; about the unpredictability of the subject matter of

11  the invention and about the undue experimentation that was

12  required to make the invention.

13       We've uncovered evidence, Judge, that Mr. Hartke and

14  Mr. Thomas, another inventor, knew facts that directly

15  contradicted false statements that the inventor made to the PTO

16  on those two points.  And what is more, we know -- talk about

17  materiality, we know the PTO, the patent office, relied on those

18  misrepresentations in deciding to allow the claims.  It is what

19  made the difference to the patent examiner.  The patent office

20  told us so.

21       This additional basis for Toro's inequitable conduct

22  defense recently came to light.  It started with the deposition

23  of the lead inventor, Brad Thomas, May 6th.  And there's been a

24  lot of talk about this vertical lift large skid steer study and

25  how it's been in pdf form produced for months before we got

1   involved in the case, in the native form for months.  But, you

2   know, the inventors all that have been deposed up to that time,

3   for the most part, kind of pointed and deferred to Mr. Thomas,

4   and that he had discussions with Mr. Hartke about it.

5         So as opposing counsel mentioned, when the schedule

6   got modified slightly in view of COVID-19 to be able to finish

7   up discovery and talked with them about being able to schedule

8   this deposition of Mr. Thomas, they wanted to do it in June.  We

9   got it done in May.

10        But he was the person who was behind this vertical

11  lift large skid steer study.  It was his work.  He was the one

12  that went out, copied the 11 large full-size skid steers, traced

13  the parts on the vertical lift linkage, the pivot points, the

14  cylinders, the loader arms.  He analyzed those things in his

15  computer modeling program, SolidWorks, and called it a study for

16  a reason.  He was interested in studying how that loader arm was

17  able to move in a vertical path as part of that linkage.

18        Well, as we point out in our papers, when

19  Mr. Tomlinson, my co-counsel, took his deposition on May 6th, we

20  didn't have the full scoop.  And what do I mean by that?  We had

21  the native file which we were looking at through a SolidWorks

22  viewer that allowed you to look at the file, but it didn't

23  provide all the details.

24        And since that deposition, we've learned a lot.

25  Important facts keep leaking out that go directly to providing a

1    strong evidentiary basis as to why the statements that

2    Mr. Hartke made to the patent office about unpredictability and

3    undue experimentation were just purely misrepresentations.  And

4    let me tell you about that.

5          First of all, we recognize that, you know, we're past

6    the deadline to amend so we know you show good cause.  The

7    deposition wasn't taken until May.  We, Toro, at that point we

8    recognized, first of all, didn't have a reason -- shouldn't have

9    a reason to doubt what Inventor Thomas told us about what he

10   did.

11         But we made inquiry at Toro.  That's not -- SolidWorks

12   isn't a program that they used.  Finally found one person in the

13   organization who had access to it -- it's an expensive

14   program -- and that really helped shed more light on what was

15   done during the development process.

16         And what you're going to hear, I'm sure, Mr. Brophy

17   say is, "Well, you know, Judge, this doesn't matter because the

18   study came too late.  You know, Vermeer already had a drawing, a

19   conception drawing, and they had been -- they had a workable

20   prototype, so this is just too late to be relevant."

21         But what we found out from the metadata was a couple

22   important things.  One is that, in fact, you could see it.  It's

23   in -- it's corroborated by one of the exhibits to Vermeer's

24   resistance.  It's Exhibit 4.  But we were able to match up with

25   the metadata that during the development of Vermeer's first

1   prototype, which they also call their mule or their test mule,

2   that in June and July of 2013, at the same time that they were

3   working on that test mule, and that's confirmed by the dates in

4   Exhibit 4 from Mr. Thomas who was checking that test mule file

5   in and out and doing work on it, at that same time, he was doing

6   the initial work on these full-size skid steers so he could

7   understand how the linkages worked and how the loader arm moved

8   in a substantially vertical fashion.

9           And so what we're talking about here is looking at

10  what someone else did and using that to help solve the problems

11  with the prototypes, but then it goes beyond that.

12          Mr. Hartke, I talked about the declaration that he

13  submitted to the patent office.  He submitted two of them to the

14  patent office, and those are Exhibits B and C to our moving

15  papers, Judge.  He talks about how on the second prototype,

16  then, they moved on from the mule.  The problem they had, it

17  wouldn't even lift -- it was so bad, it wouldn't even lift the

18  bucket off the ground.

19          Well, what happened?  Well, as Mr. Thomas told us,

20  because he was the one responsible for designing that linkage

21  for the position of the pivot points and where they went, his

22  words were "went back to the drawing board."  What did that

23  mean?  What he said was he did the vertical lift skid steer

24  study.

25          Now, that's what he told us at his deposition is when

1  he started it, in 2014.  We now know from the files that we have

2  using the full program he actually started it a year earlier.

3      But the files do show that, yes, he went back and was

4  going back to that vertical lift full-size skid steer study to

5  examine just how that vertical lift mechanism worked with the

6  larger machines, and that work was being done in March of 2014.

7  The metadata from that file, when we're able to get it in the

8  full SolidWorks program, confirms that.

9      What happens a few days after that, voila, they solve

10  the problem with where the pivot points need to be, and he

11  finalizes, that is Mr. Thomas finalizes, the design for the

12  vertical lift linkage for the first commercial product that

13  became the basis for the patent.

14      The problem is that Mr. Hartke, who had talked, we

15  know, and discussed with Mr. Thomas his work with that full-size

16  vertical lift study, didn't tell the patent office any of that.

17  And it's not simply, Judge, that they -- that he didn't -- that

18  he kept it to himself or it was concealed.  He misrepresented

19  the design process, describing it as being unpredictable and

20  requiring all kinds of undue experimentation, when the patent

21  office never had the benefit of knowing that they were looking

22  at what other people were doing and had done before with

23  full-size skid steer loaders to solve the problem.

24      Now, I suspect you'll also hear from Mr. Brophy that,

25  you know, these allegations of inequitable conduct have become a

1   plague on the patent system, and that's why we allege these

2   things with great -- after great investigation.  And, yes, the

3   *Therasense* case certainly has raised the bar when it comes to

4   materiality, how material was it, the misrepresentation, the

5   omission of that information.

6          What does that mean to be material?  It has to be

7   but-for material; but for that misrepresentation, the patent

8   office would not have allowed the patent.  Judge, we have that

9   here in spades because if you look at the patent office's

10  reasons for allowance -- sometimes when they conclude these

11  matters, they provide a reason for allowance.  You have some

12  insight as to, you know, why did they decide to -- why did they

13  decide to go ahead and allow the case.

14         Well, what the patent examiner said here was -- and I

15  tell you what, this is a very rare instance.  Patent examiner

16  here said, "It would appear this invention is obvious," and then

17  went through a discussion as to why ultimately the examiner was

18  going to conclude otherwise, and the examiner concluded with the

19  following:  "In particular, the declaration of Louis Hartke is

20  persuasive."

21         And it's not just that, but what was it persuasive on?

22  It was persuasive to show the "design of a vertical lift having

23  a four-bar linkage requires considerable experimentation and a

24  combination such as," and they put the prior art in there,

25  "would not have been obvious at least because it would require

1 undue experimentation."

2          Excessive, considerable experimentation, he said, the

3 examiner said, undue experimentation, finds those statements

4 particularly persuasive, allows the case.  What's entirely

5 missing here is any discussion -- and it's not just that, but

6 the misrepresentation that they used the vertical lift study and

7 used that to solve the problem.

8          Now, did they copy -- we're not saying they copied to

9 a T, but they went back and they used it in two occasions to use

10 what someone else did with full-size machines to solve the

11 problem on their smaller machine.  And, Judge, that is why the

12 materiality element is met.

13          The second element is, of course, intent to deceive.

14 Now, at the pleading stage -- when we get to trial, the

15 requirement is that the only reasonable inference drawn from the

16 facts by clear and convincing evidence is that there is an

17 attempt to deceive.  But at the pleading stage, it's sufficient

18 that, based upon the facts that have been alleged in the amended

19 complaint, there is a reason -- there is a reasonable inference.

20          And what opposing counsel has done and likes to do in

21 their resistance papers is just argue the merits of the matter.

22 But at this point, the question is were we diligent, first of

23 all.  Yes.  These are facts that recently came to light.  And,

24 secondly, do the factual allegations contained in the complaint

25 state a claim?  And they do because of materiality meets the

1   but-for standard.  And also there is a reasonable inference,

2   more than reasonable inference, but there's certainly a

3   reasonable inference to draw from those facts that Mr. Hartke

4   and Mr. Thomas intended to deceive the PTO.

5           We are a year away from trial.  We can see no possible

6   prejudice to Vermeer in this regard.  The only harm that could

7   be done is to the integrity of the patent system, and that is

8   what these inequitable conduct charges are all about.

9           I'll close by saying that this story of the invention,

10  I mean, this is going to come in because it shows the

11  development process and the fact that they understood that these

12  large skid steers and their linkages were relevant, or one of

13  the ordinary skill in the art would.  It's relevant to

14  obviousness.  The story is going to come in, and we think that

15  we have certainly met the threshold requirements for pleading

16  inequitable conduct and ask that we be allowed leave to amend.

17          THE COURT:  A final question for you, Mr. Harty,

18  before I get back to Mr. Brophy.  Is the question of inequitable

19  conduct that you have pleaded and you wish to amend, is that for

20  the jury or is it for the Court to decide since it has to do

21  with equity?

22          MR. HARTY:  Typically, Judge, in my experience, the

23  underlying factual inquiries have gone to the jury, but at the

24  end of the day, the ultimate conclusion is a legal one for Your

25  Honor.

1          THE COURT:  Do you agree with that, Mr. Brophy?

2          MR. BROPHY:  Your Honor, Vermeer's position is that

3   the matter is exclusively for the Court to resolve, not for the

4   jury.

5          THE COURT:  Now you may make your final argument in

6   response to the request to amend the factual basis for

7   inequitable conduct.

8          MR. BROPHY:  Thank you, Your Honor.

9          THE COURT:  Mr. Brophy.

10         MR. BROPHY:  Thank you.

11         I think it's important here to focus on the actual

12  facts that are of record in the case.  My colleague spent a lot

13  of time talking about a narrative that Toro's counsel has

14  constructed that is utterly divorced from any record facts in

15  this case, utterly divorced.

16         Here are the actual facts:  Toro has been in

17  possession of the vertical lift skid steer study documents in

18  pdf form since December of 2018.  They've been in possession of

19  the native version of that file since -- for ten months.  The

20  notion that no one on that side of the v. sought to open that

21  file with a SolidWorks program is incredible.

22         But setting that aside for a moment, there is nothing

23  in that SolidWorks file that yields any record facts that would

24  support the narratives you just heard from my colleague on

25  behalf of Toro.

1          The fact of the matter is this vertical lift skid

2    steer study has nothing to do with the invention that's at issue

3    in this case.  Every single Vermeer employee who has been

4    deposed about it said exactly that.  Not a single Vermeer

5    employee and not Brad Thomas either has said that that file or

6    that study was used in any way to support the development of the

7    invention in this case.  That is a manufactured narrative from

8    Toro's counsel.

9          And because of that, nothing in Brad Thomas'

10   deposition can be used as a basis to show diligence or the

11   timeliness of this very late request to amend contention -- to

12   amend their affirmative defense for inequitable conduct.  There

13   is simply no reason for it.

14         Now, I think it's important, and there is something

15   Mr. Harty and I agree on, and that is there are two fundamental

16   elements here that have to be addressed.  One is diligence, and

17   the other is whether the facts as Toro seeks to plead them state

18   a claim.

19         There are two key reasons why the Court should deny

20   this motion.  Number one, Toro has not shown diligence in

21   seeking amendment of its affirmative defenses.  Number two, the

22   amendment would be futile because they do not state a claim.

23   And I'm going to talk about each of those in turn.

24         Number one, let's talk about diligence.  As I've

25   mentioned, Toro has been in possession of this vertical lift

1  skid steer study since December of 2018, and for ten months

2  they've had the actual native file.  It is simply not

3  supportable for Toro to say that they exercised due diligence

4  when they failed to even try to open that file with the native

5  program until several weeks ago.  That is the opposite of due

6  diligence.

7           SolidWorks is a very basic engineering CAD program.

8  There are thousands and thousands of engineers all over the

9  country that use that software, and there are hundreds of

10  consultants available at the click of a button who you can

11  retain to open those files.  So the notion that Toro simply

12  couldn't find some way to open this file doesn't hold water.

13           I could, in a single day, identify ten consultants who

14  I could send that file to who could open that file, who could

15  share their screen and answer questions about that file, so the

16  fact that Toro chose not to do that for ten months demonstrates

17  their lack of diligence.

18           Then they like to point to Brad Thomas' deposition as

19  some watershed moment for this inequitable conduct allegation.

20  And, Your Honor, I would urge you to go look at that actual

21  deposition.  Rather than what Toro says about it, go look at

22  what Mr. Thomas actually said in that deposition.  He said time

23  and time again, "I did not use that vertical lift skid steer

24  study in any way to design the invention that's at issue in this

25  case."  That's his actual testimony.

1          Now, he also said, "I did not dimension the machines

2     that I was studying," and that's true.  Toro -- Toro contends

3     that's a lie.  But the fact of the matter is the machines that

4     are identified in that file are not accurately sized, and the

5     fact that they just recently identified dimensions in that file

6     is utterly inconsequential.

7          This is a CAD program.  The computer has to know how

8     long each of the lines are that are drawn in the file.  And when

9     Toro received the original version of this Solid -- pardon me --

10    the SolidWorks file, the skid steer study, back in December of

11    2018, they should have known, and anyone would know, that that

12    CAD file has dimensions in it because that's how CAD works.

13    Computer-aided drafting, that's how it works.  You draw a line.

14    Machine records how long that line is, and it gives it a

15    dimension.  It's fundamental operation of a CAD program.

16         It is incredible for Toro and its counsel to sit here

17    in front of this Court and suggest that they just didn't know

18    that this SolidWorks file had dimensions in it until several

19    weeks ago.  That is incredible.  So there is no diligence here

20    because Toro's counsel knew darn well that this file had

21    dimensions in it.

22         The fact that they waited ten months to open the file

23    in the native program and then feigns to discover that it has

24    dimensions only as of that date very recently simply doesn't

25    hold water.  Anyone and everyone, everyone at Toro and Toro's

1  counsel, knew that that file had dimensions in it, and they did

2  not recently discover that.  There is no diligence here.

3       And there is nothing in Brad Thomas' deposition that

4  shed light on that file, anything more than what anyone who

5  works with SolidWorks or even has a passing interest in

6  computer-aided drafting would understand receiving that file in

7  December of 2018.  Brad Thomas did not educate them on anything,

8  and if you look at the record of the actual transcript, you'll

9  see that.

10       Now moving on to the actual substance of their

11  requested amendment, it fails for two reasons.  Not only was

12  there lack of diligence here, but they cannot state a claim.

13  Number one of these two reasons, they need to show under

14  *Therasense* that there is some but-for material withholding, some

15  failure to disclose material evidence.

16       Now, there are only two things that could have been

17  disclosed.  One is the skid steer study files, and the other is

18  the identity of the machines that are depicted in that file.

19       As to the first of those two things, the skid steer

20  study file itself, it's not prior art so it can't be but-for

21  material.  There was no obligation to disclose it because it's

22  not a prior art reference.

23       And secondly, the actual machines depicted in that

24  file, they were disclosed to the patent office.  Patent office

25  had those machines that are depicted in the file since the very

1    early days of prosecution in this case.  So there's been no

2    withholding of that material because it was in front of the

3    patent office.

4          Now, the third thing they claim was withheld was the

5    story, the story about how the inventors actually relied on that

6    SolidWorks file to invent the machine that's now patented.  The

7    problem is that isn't the truth.  All the inventors in the case

8    have told Toro time and time again, "We didn't use the skid

9    steer study."  So there's nothing to disclose because that

10   narrative had been constructed by Toro's counsel.

11         So there is no smoking gun.  There is no document, no

12   aha moment that we need to disclose to the patent office.  It

13   doesn't exist because the inventors never used this file.  And

14   you don't even have to take my word for it or the sworn

15   testimony of the inventors for it.  If you look at, Your Honor,

16   some of the filings that we've made, I believe it's ECF 245, we

17   supplied Your Honor with a picture of the machines that they

18   contend were copied and the actual machine that's patented and

19   asserted in this case, and they're different.

20         So this whole notion that Toro's attorneys have cooked

21   up of Vermeer's employees using that skid steer study to guide

22   the development of their machine is based on this fundamentally

23   and clearly false premise because in order for it to be true,

24   the machine that we patented would have to have the same

25   vertical lift mechanism that's shown in the vertical lift skid

1   steer study, and they're not the same.  Not even remotely close.

2          The linkages are of different lengths.  They're

3   different relative links to one another.  They're in different

4   positions.  They're positioned in different angles.  And all of

5   that is set forth in that Document ECF 245.  So this whole

6   notion, this whole house of cards is built on the single notion

7   of a copy being made, but it's also -- but it's false, and if

8   you look at 245, it's crystal clear why it's false.

9          So fundamentally, there is nothing for us to have

10  disclosed or to have withheld because we gave the patent office

11  the machines that are depicted.  The vertical lift skid steer

12  study is not prior art.  It wasn't created until well after

13  Vermeer conceived of its invention.  And there is no smoking gun

14  document because this narrative is a false narrative cooked up

15  by Toro so there is no other document to disclose.

16         In addition to that, they have to show under

17  *Therasense* that there is intent, that our inventors intended to

18  deceive the patent office by withholding or omitting this

19  information.  And the case law is crystal clear, we cited this

20  in our briefing, you cannot rely merely on the failure to

21  disclose to show intent.  You have to have some separate factual

22  basis to allege intent.  They have none.

23         There is not a shred of evidence that they can point

24  to, and they haven't done so in their briefing, to indicate or

25  show that there is a factual basis for intent to deceive the

1 patent office.  It does not exist because it did not happen.

2         The only evidence that exists is the opposite, that we

3 did not intend to deceive the patent office because we disclosed

4 all the machines depicted in that vertical lift skid steer study

5 to the patent office.  So if we intended to deceive the patent

6 office, we certainly wouldn't have disclosed the prior art that

7 Toro contends we used to develop our machine.  That doesn't make

8 any sense.

9         So they didn't exercise diligence because they've had

10 this file for ten months and they knew -- or even longer,

11 December of 2018, and they and Toro knew darn well that that

12 file had dimensions in it.  Everybody knows that.  They're

13 hoping the trick the Court.  Everybody knows CAD files have

14 dimensions in them, full stop.

15         So there was no diligence, they can't show a but-for

16 material omission because we disclosed everything we were

17 supposed to, and they can't show any factual basis for intent.

18 What is actually going on here is that they lost their attempt

19 to add their invalidity arguments at the eleventh hour, and this

20 is now their attempt at a second bite at the apple.

21         If you look at the timing, it's awfully curious.  They

22 didn't file this motion to add this new affirmative defense for

23 inequitable conduct until after Your Honor excluded their

24 invalidity arguments.  And only then did they decide, "Oh, wait.

25 We have to amend and add a new affirmative defense for

1   inequitable conduct because that's our way to backdoor in the

2   invalidity arguments that the Court has just excluded."  That's

3   what's actually going on here.

4          There is no objective basis to add this affirmative

5   defense.  It is purely being added as a second bite at the

6   apple, as a backdoor attempt to bring in the prior art that Your

7   Honor already excluded.

8          And we know this because the last time we were in

9   front of you arguing, I suggested that they were advancing an

10  inequitable conduct theory, and my colleague, Mr. Harty, said,

11  "No, we are not."  He said exactly that, and we cited it in our

12  brief.  And yet weeks later, after Your Honor comes out with its

13  ruling excluding the prior art, suddenly they have a new

14  affirmative defense for inequitable defense, the fifth in this

15  case.  Five, five separate allegations of fraud on the patent

16  office.

17         There is no merit for this.  They cannot show

18  diligence, they can't show materiality, they can't show intent,

19  and for those reasons the Court should deny this motion, Your

20  Honor.

21         Thank you.

22         THE COURT:  Thank you.

23         I will now remind you that the order that was entered

24  on March 20th sets the schedule for trial as being June 7th of

25  next year and sets a number of other deadlines for completing

1   pretrial work.

2          I now finally emphasize three things.  Number one, I

3   won't rule on the motions right now but will get out a ruling

4   within a week.  I probably will allow the amended factual basis

5   for inequitable conduct, and I will probably not change the

6   order entered that scheduled trial for June 7th, 2021.

7          And, finally, if you wish to order, Kelli Mulcahy is

8   our court reporter.  She's been on the phone to take your oral

9   arguments.  Make your request soon so she can get out a

10  transcript of these oral arguments.

11         Thank you for your excellent presentations.  I'll get

12  a ruling on the motion to amend within a week.

13         Thank you.  Good-bye.  That ends the hearing.

14         (Proceedings concluded at 1:47 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2          I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3   the State of Iowa and Federal Official Realtime Court Reporter

4   in and for the United States District Court for the Southern

5   District of Iowa, do hereby certify, pursuant to Title 28,

6   United States Code, Section 753, that the foregoing is a true

7   and correct transcript of the stenographically reported

8   proceedings held in the above-entitled matter and that the

9   transcript page format is in conformance with the regulations of

10  the Judicial Conference of the United States.

11         Dated at Des Moines, Iowa, this 7th day of December,

12  2020.

13

14

15                    /s/ Kelli M. Mulcahy
                      Kelli M. Mulcahy, CSR, RDR, CRR
16                    Federal Official Court Reporter

17

18

19

20

21

22

23

24

25